[Civil No. 3247.   Filed January 16, 1933.]

[18 Pac. (2d) 263.]

BEN LEVY and TERESA LEVY GUERRERO, Appellants, v. ROSS H. BLAKELY, as Administrator of the Estate of GABRIEL LEVY, Deceased, Appellee.

Mr. Louis L. Wallace and Mr. Carl D. Hammond, for Appellants.

Mr. Charles P. Elmer, for Appellee.

LOCKWOOD, J.—This is an appeal from an order of the superior court of Mohave county granting to Ross H. Blakely, hereinafter called appellee, letters of administration of the estate of Gabriel Levy, deceased.

The facts necessary to a determination of the case, with one exception, are not in serious dispute, and we state them as follows: Gabriel Levy died intestate on or about January 28th, 1932, leaving estate of the estimated value of $8,000. A petition for letters of administration was filed by appellee, as the nominee of Jennae Sarette Levy, a niece of the deceased, who resided in San Francisco. At the same time another petition asking for letters was filed jointly by Ben Levy and Teresa Levy Guerrero, hereinafter called appellants, who claimed to be the only surviving children of the deceased. In accordance with the statute, the petitions were heard together, and at the close of the hearing the court denied the petition for appellants and granted that of appellee. Written findings of fact and conclusions of law were filed, and appellee duly qualified as administrator and is so acting at the time of this appeal.

From the evidence it appears that the deceased during the year 1893 was living in Mohave county, Arizona. Some time during that year he became acquainted with a woman known as Tula Eshom or Tula Lucero. This woman had legally married one Jose Lucero in 1883, and there were born as the result of said marriage four children. In 1889 she left Lucero, and, so far as the evidence shows, never again lived or cohabited with him. Shortly after her meeting deceased, he asked her to live with him. The evidence is in dispute as to whether or not she was to act as his wife or his mistress, but at all events she did live and cohabit with him from the year 1893

to 1902. During this period there were born to her two children, the appellants herein. There is evidence in the record from which the court could have found that these children were also the children of deceased, and for the purposes of this opinion we shall assume they were, although the findings of fact by the trial court are to the contrary on this point.

During all of the period that deceased and Tula Lucero were living together the marriage relation theretofore existing between her and Jose Lucero had never been dissolved either by death or divorce. Some time in the year 1912, and ten years after she had ceased cohabiting with deceased, her marriage with Lucero was duly dissolved by a court of competent jurisdiction, and about a year later she married one Juan Eshom, the ceremony being performed by deceased, who at that time was the justice of the peace. We think these facts sufficient for the determination of the legal questions involved in the case.

It is claimed by appellants and admitted by appellee that the right to letters of administration is fixed by statute, and that children of the deceased are entitled to such letters in preference to more remote relatives or their appointees. It is further agreed by both parties that the children entitled to such preference must be legitimate or legitimized in accordance with the law.

The dispute is as to whether or not appellants, who admittedly on the facts could not be legitimate children in the ordinary sense of the term, were legitimized by statute. It is contended by appellants that paragraphs 3095 and 3098 of the Civil Code of 1901 had this effect. They read as follows:

"3095. When any unmarried persons who have heretofore lived together as husband and wife, and who have had a child or children born out of wedlock, shall have intermarried with each other, such child

or children so born out of wedlock, shall be and the same are hereby declared to be legitimate, and entitled to all the rights and privileges of children born in wedlock.''

''3098. All persons who at any time heretofore have lived together as husband and wife for the period of one year or more, and who shall continue to live together for the period of one year from and after the time this chapter takes effect, or until one of the parties shall die, if death occurs before the expiration of one year after this chapter takes effect, shall be considered as having been legally married, and the children heretofore or hereafter born of such cohabitations are declared legitimate.''

It is obvious, we think, that paragraph 3095 has no application under the facts of the present case. By its terms it applies only to unmarried persons who have lived together as husband and wife and have a child born, and who afterwards intermarry with each other. Since Tula Lucero was not an unmarried person at the time she was living with deceased and never at any time married him, there can be no serious contention by appellants that this section has the effect of legitimizing them. Their real reliance, however, is on paragraph 3098, *supra,* and it is the interpretation of this paragraph which will determine the case.

The primary question for our consideration is whether the paragraph is one whose true purpose was the legitimization of children, or whether it was intended to validate contractual marriages, the effect of such validation on children being an incidental one. In order to determine this, it is necessary that we review briefly the common and statutory law governing the marriage relation and the legitimacy of children. Under the common law, legitimate children were only those born in and as a result of a lawful marriage. Children not so born were held illegitimate, even though their parents intermarried after

their birth, and nothing but the action of Parliament had the power to legitimize them. For this reason, following the American adoption of the common law, many, if not most, of the states have passed statutes which have the effect under certain circumstances of legitimizing children born out of lawful wedlock, but it must always be remembered that such legitimization is purely the creature of the statute and is effected only in accordance with the terms thereof.

What is necessary to constitute a lawful marriage? Under the common law, marriage was held to be a civil contract creating a certain status. The essentials of such contract were originally capacity and consent. It was necessary that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract and consummated by their cohabitation as man and wife, or their mutual assumption openly of marital duties and obligations. 38 C. J. 1316. In addition thereto, in England the common law required a form of religious solemnization also, and the doctrine that marriages could be valid *per verba de praesenti* or *per verba de futuro* followed by cohabitation alone was expressly repudiated. *Regina* v. *Mills,* 8 Reprint 844, 17 E. R. C. 66; *Beamish* v. *Beamish,* 9 H. L. Cas. 274, 11 Reprint 735.

In the United States, however, the large majority of the states have recognized the contractual marriage made without any formal solemnization by an authorized person, and it is usually, though incorrectly, called "common law" marriage. Kent. Com., vol. 2, § 26, p. 74; 38 C. J. 1315, and note. In some jurisdictions, however, this doctrine of contractual marriage without solemnization has always been rejected, and many other states which formerly accepted it have since specifically abolished it by statute. The

courts of this state have never been called upon to pass expressly upon this question. The matter is one for regulation by the legislature, and it is therefore to the statutes that we must turn to determine whether or not the contractual marriage ever existed in Arizona and, if so, whether and when it was abolished.

In 1865 the legislature of Arizona adopted an act regulating marriages (Laws 1865, p. 58) which was carried forward into the Comp. Laws of 1877 (sections 1891, 1896, 1898). The essential provisions of that Code read as follows:

"Section 1. Marriage is considered in law as a civil contract, to which the consent of the parties is essential."

"Section 6. The governor of the Territory, every judge and justice of the peace, and every clergyman of any denomination, or licensed preacher of the gospel, may perform the ceremony of marriage in this Territory."

"Section 8. Every person having authority to join others in marriage shall keep a record of all marriages solemnized before him, and within three months transmit a certificate of every marriage (containing both christian names and surnames) to the recorder of the county in which the marriage took place. . . . "

Nothing whatever is said as to whether contractual relations alone constituted a valid marriage, and no provision was made for a license to be taken out as a preliminary to the solemnization of marriage.

In 1887 the laws were recodified. At that time the above provision declaring marriage to be a civil contract was dropped. That relating to the persons authorized to solemnize marriage was readopted in modified form, and paragraph 2088 was added (Civ. Code 1887). This paragraph reads as follows:

"2088. Any person desirous of marrying shall apply to the county recorder of the county, and shall

receive from him a license directed to the persons authorized by law to solemnize the rites of matrimony which shall be sufficient authority for any one of such persons to solemnize such marriage.''

In addition thereto, paragraphs 2094 and 2095 were inserted. These paragraphs are *verbatim* the same as 3095 and 3098 of the Civil Code of 1901, *supra.*

In 1913 paragraphs 3833 and 3844, which read as follows, were enacted:

''3833. No persons shall be joined in marriage within this state until a license shall have been obtained for that purpose from the clerk of the superior court of the county in which one of the parties reside, or in which the marriage is to take place.''

''3844. The common law rule that a marriage may be contracted by agreement of the parties without marriage ceremony is hereby abrogated, and no marriage contracted within this state shall be valid unless a license be issued as provided in this chapter, and a marriage solemnized by one of the persons authorized by law, or by some one purporting to act in the capacity of a clergyman, judge or justice, and believed in good faith, by at least one of the parties, to be such.''

Paragraph 3840, which was similar to paragraph 3095 of the Civil Code of 1901, was again re-enacted, but paragraph 3098 was entirely omitted.

In 1921 the legislature adopted an act (chapter 114), the first section of which reads as follows:

''All children declared legitimate. Every child is the legitimate child of its natural parents and is entitled to support and education as if born in lawful wedlock. . . . This section shall apply to cases where the natural father of any such child is married to one other than the mother of said child, as well as where he is single.''

This section was re-enacted in the Revised Code of 1928 (section 273), and that Code in its chapter re-

ferring to marriages dropped paragraph 3840 of the Civil Code of 1913.

On reading these successive enactments, can we gather therefrom any indication as to the intent of the legislature? We think that, when they are compared in their chronological order, it will be seen that there was a constant and steady change in the attitude of the state toward the irregular marriage and children born outside of wedlock.

In 1865 marriage was expressly declared a civil contract, and the state imposed no preliminary requirements on the persons entering into such contract, though it did recognize the fact that marriages were generally solemnized openly by some regular authority. There was no provision whatever for legitimizing offspring born outside of the marriage relation, whether such marriage was formal or merely contractual. The latter method of marriage was neither recognized nor repudiated, and, had there been no change in the statute, we might perhaps have assumed that the legislature accepted without question the usual rule of the American courts that contractual marriages were valid. In 1887, however, it was expressly provided that any person who desired to marry must apply for a license authorizing some one of the parties designated by statute to solemnize the marriage. The provision in regard to marriage constituting a civil contract was dropped, and for the first time a method was provided for legitimizing children born outside of wedlock. Paragraph 2094, which is the same as paragraph 3095 of the Civil Code of 1901, was enacted.

It will be seen by this that, in order for the statute to apply, the parents must (a) have been unmarried; (b) must have lived together as husband and wife; (c) must have had children born out of wedlock; and (d) have intermarried with each other within twelve

months after the time the act went into effect. The obvious, and indeed the only possible, purpose of such statute was, not to affect the marriage relation, for a legal marriage was required before the statute had any effect, but merely to legitimize the children who were born before their parents were legally married.

At the same time the legislature enacted paragraph 2095, which is the same as paragraph 3098 of the Civil Code of 1901, relied on by appellants in this case. It will be seen on examining this paragraph there are several peculiar provisions therein. In the first place, it only applies to relationships which existed before the paragraph was adopted, and in no manner affects those entered into thereafter. In the second place, it nowhere makes the birth of children a requisite to its application, as did paragraph 2094. In the third place, it expressly and directly affects the marriage relation itself, for it says the parties living together as husband and wife "shall be considered as having been legally married." It will be seen that the parties affected thereby are those only who have *previously* performed the acts necessary to constitute a contractual marriage, and after the passage of the act continued those acts for a given time. If the contractual marriage then existed in Arizona as a matter of law, the statute was wholly unnecessary and accomplished no purpose, for the children of a contractual marriage where such is held to be legal need no legitimization, nor is it necessary to declare their parents married, for they are already as a matter of law husband and wife, with all the rights and duties appertaining to that relation. If, however, in the opinion of the legislature, contractual marriages were not legal, but many parties in the state, assuming them to be valid, had entered into that relationship in good faith and property rights had grown

up and children been born thereunder, it would be most natural and highly commendable for the legislature to provide that parties who had lived together as husband and wife, and who, after the statute was adopted, knowing its purpose, continued so to live together for the period specified, should be considered legally married, and that all the effects of a legal marriage flowed therefrom. This view is strengthened by the fact that in 1901 paragraph 2095 was re-enacted in the same language and again limited to relationships which had become initiated between 1887 and 1901, but had no effect on relationships begun after 1901. If, as contended by appellants, the purpose of the statutes cited was primarily the legitimization of children, they would have been highly unjust, for they would have discriminated between the children of such relationships initiated before the adoption of the law and those begun thereafter. For this reason it is inconceivable to us that the legislature adopted them for the protection and legitimization of children born out of wedlock.

It is true that in paragraphs 3833 and 3844 of the Civil Code of 1913, for the first time contractual marriages were specifically and formally abrogated. We think, however, that the only reasonable presumption is that the true cause for these last sections is that the legislature, viewing the recurrence of relationships which required legitimization at frequent intervals by the legislature, determined that it would expressly forbid them in the future, and that parties who entered into them did so at their peril.

We have been cited to no statute whose terms are similar to that of paragraph 3098, *supra*. Counsel for appellants place great reliance upon the case of *Wadsworth* v. *Brigham*, 125 Or. 428, 259 Pac. 299, 266 Pac. 875. The legislature of Oregon in 1925 adopted the following statute:

"In case a man and a woman, not otherwise married heretofore, shall have cohabited in the state of Oregon as husband and wife, for over one year, and children shall be living as a result of said relation, said cohabitation, if children are living, is hereby declared to constitute a valid marriage and the children born after the beginning of said cohabitation are hereby declared to be the legitimate offspring of said marriage." Laws 1925, p. 484.

And the court in construing this statute says as follows:

"We take it that this statute was enacted chiefly for the protection of such unfortunate children from the consequences of the sins of their. parents rather than for the protection of the parents themselves from the consequences of their own misdoings. It has been well settled in this state in the case of *Huard* v. *McTeigh, supra* [113 Or. 279, 232 Pac. 658, 39 A. L. R. 528], that common-law marriages cannot exist in this state, and we take it that it was not the intent of this statute to restore common-law marriage to the condition of legitimacy, but rather to protect the issue of irregular and illegitimate cohabitation from the consequences which would otherwise accompany it. The requirement that the parties should have lived together and cohabited as man and wife has no real significance as effecting the legitimacy of their relation."

It will be noted on comparing this statute with paragraph 3098, *supra,* first, that it applies to relationships entered into both before and after the adoption of the statute, and, in the second place, it is limited expressly to cases where children are living as a result of the relationship, and does not, as do our statutes, apply to cases when no children whatever have been born therefrom. It will further be noted that before the passage of the statute the Supreme Court of Oregon had expressly declared that contractual marriage had been abolished by the legislature of Oregon, and the presumption is the legisla-

ture did not mean to restore what it had previously abolished.

We think, upon a careful consideration of our statutes from the establishment of the territory to the present time, that at an early date our legislature took the view that contractual marriages did not exist in Arizona, but, realizing the weaknesses of human nature, in 1887 and in 1901 adopted curative statutes declaring, as it had the power to do, that relationships previously entered into which had the qualities of contractual marriage should be recognized as constituting valid marriages, but declining expressly to extend recognition to such relations entered into after the passage of the particular curative statute, and that paragraph 3098, *supra,* instead of being a statute for the legitimization of children, was instead a statute for the recognition of certain statuses specified therein as being valid marriages *ab initio,* and that the legitimization of the children referred to was merely an incident to the legalization of marriage.

Such being the case, it follows that it necessarily applied only to persons who were capable of entering into a valid marriage contract, but who had failed to comply with the forms of law governing such contract. If we are to assume that the statute when it says "all persons" means "all persons married or unmarried," its effect would be to have given Tula Lucero two legal husbands from 1889 to 1912, and she would have had all the marital rights and been subject to all the marital duties toward both husbands at the same time, for the provision "shall be considered as having been legally married" is just as much a part of the paragraph as "the children heretofore or hereafter born of such cohabitations are declared legitimate." To imagine such was the intent of the legislature is absurd.

As confirming this view, it will be noted that, when the legislature in 1921 decided to legitimize children regardless of the marital status of their parents, it made no attempt to declare that the parents should be considered as married, but said "Every child is the legitimate child of its natural parents and is entitled to support and education as if born in lawful wedlock. . . . This section shall apply to cases where the natural father of any such child is married to one other than the mother of said child, as well as where he is single."

Taking all these things into consideration, we hold that paragraph 3098 only applied to persons who at some time after the arising of the relationship and throughout its existence were capable of contracting marriage, and not to those who were incapable of entering upon such relationship in the legal manner. For the foregoing reasons, under the admitted facts of the case, we hold that appellants, whether or not they were the natural children of deceased, were never legitimized by law, and are so incapable of inheriting from him, and that the trial court properly denied them letters of administration and granted the same to appellee.

The order appealed from is affirmed.

ROSS, C. J., and McALISTER, J., concur.